**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Mark Zaid,<br><br>  *Plaintiff,*<br><br>  v.<br><br>Department of Justice,<br><br>  *Defendant.* | Case No. 8:21-cv-01130-GJH |
| Mark Zaid,<br><br>  *Plaintiff,*<br><br>  v.<br><br>Department of Justice,<br><br>  *Defendant.* | Case No. 8:21-cv-02625-TDC |

---

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

Erek L. Barron
United States Attorney
Alan C. Lazerow
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
(410) 209-4800
Alan.Lazerow@usdoj.gov

*Counsel for Defendant*

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. FACTS AND ADMINISTRATIVE PROCEEDINGS ...................................................... 2

    A. PLAINTIFF'S FOIA REQUEST............................................................................ 2

    B. SEARCH FOR RESPONSIVE RECORDS AND THE FBI'S PRODUCTION ................. 3

        i. The FBI's Central Records System and Sentinel ......................................... 3

        ii. FBI's Search Process – Generally and In This Case .................................. 5

          a. *Main File Search of the CRS*……………………………………………………6

          b. *Term Search of the CRS*......................................................... 6

          c. *Targeted Search by the Criminal Investigative Division* ........................ 7

        iii. The Production of Responsive Documents and Administrative History.................. 8

    C. THE COMPLAINT, THE DOCUMENT RELEASES, AND THE NARROWING OF ISSUES FOR SUMMARY JUDGMENT.................................................................................... 10

III. STANDARD OF REVIEW:  SUMMARY JUDGMENT UNDER RULE 56(a) .......... 11

IV. ARGUMENT ........................................................................................................ 14

    A. DEFENDANT CONDUCTED A REASONABLE SEARCH ...................................... 15

    B. DEFENDANT PROPERLY ASSERTED VARIOUS FOIA EXEMPTIONS ................. 18

        i.   Defendant Properly Asserted Exemption 7(A) ...................................... 18

        ii.  Defendant Properly Asserted Other Underlying Exemptions. ............... 22

a.  *Exemption 3* ................................................................................. 22

b.  *Exemption 5* ................................................................................ 23

   I.  Deliberative Process Privilege…….……………………………………..…24

   II.  Attorney Work Product Privilege ........................................ 25

c.  *Exemptions 6 and 7(C)* .................................................................. 27

iii.  Defendant Properly Asserted Exemption 7(D) ....................................... 28

iv.  Defendant Properly Asserted Exemption 7(E) ...................................... 30

v.  The IRS Properly Asserted Exemption 3 ................................................ 31

vi.  EOUSA Properly Asserted Various FOIA Exemptions ........................... 32

vii.  ICE Properly Asserted Various FOIA Exemptions ................................. 32

viii. The Government Has Satisfied Any Duty to Segregate .......................... 33

V.  CONCLUSION ................................................................................ 34

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Mark Zaid, | |
| *Plaintiff,* | |
| v. | Case No. 8:21-cv-01130-GJH |
| Department of Justice, | |
| *Defendant.* | |

| | |
|---|---|
| Mark Zaid, | |
| *Plaintiff,* | |
| v. | Case No. 8:21-cv-02625-TDC |
| Department of Justice, | |
| *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States Department of Justice (the "<u>Defendant</u>"), through its counsel, Erek L. Barron, United States Attorney for the District of Maryland, and Alan C. Lazerow, Assistant United States Attorney for that district, submits this *Memorandum of Law in Support of Motion for Summary Judgment* (the "<u>Motion</u>").

## I.   <u>INTRODUCTION</u>

Mark Zaid, the plaintiff and counsel to Zackary Sanders—who was prosecuted for and convicted of child pornography and related crimes—in various proceedings, "made the unusual strategic decision to split up … fourteen categories and bring separate FOIA lawsuits in different

districts across the country, using residents of those districts (including, … Mr. Zaid himself) as putative plaintiffs, but relying on substantially similar, if not identical, FOIA requests." *Michels v. USDOJ*, No. 1:21-cv-01737, 2021 WL 8153753, at \*1 (D. Colo. Nov. 30, 2021).   These consolidated cases are two such lawsuits.

By the complaints in these consolidated cases, Mark Zaid (the "Plaintiff") originally challenged Defendant's then categorical withholding of documents related to a fourteen-part request he made under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), pertaining to the Government's investigation and prosecution of Sanders (resulting in his conviction). Defendant produced all responsive, non-exempt documents to Plaintiff.  Plaintiff now challenges both the adequacy of Defendant's search as for eleven parts of his FOIA request and Defendant's withholdings and redactions for those eleven parts.

Summary judgment in Defendant's favor is appropriate.  The attached and comprehensive Declaration of Michael Seidel (the "Seidel Decl.")[1] and the exhibits thereto (including a *Vaughn* index explaining Defendant's redactions and withholdings and the bases therefor) establish that Defendant adequately searched for responsive records and properly invoked the pertinent FOIA exemptions.  Because Defendant satisfies those burdens under the FOIA, and because Plaintiff cannot show a material issue as for Defendant's good faith, Defendant is entitled to summary judgment, under Rule 56(a) of the Federal Rules of Civil Procedure (the "Rules").

## II.    FACTS AND ADMINISTRATIVE PROCEEDINGS

### A.    PLAINTIFF'S FOIA REQUEST

On April 1, 2021, Plaintiff submitted a FOIA request to the FBI requesting records

---

[1]    A copy of the Seidel Decl. is attached as **Exhibit 1**.

pertaining to fourteen[2] specific topics associated with Zackary Sanders (the "<u>FOIA Request</u>").  *See* Seidel Decl. ¶ 5.  By letter dated April 6, 2021, the FBI advised Plaintiff that it assigned the FOIA Request FOIPA Request Number 1493560-000.  *Id.* ¶ 6.

**B.    <u>S</u>EARCH FOR <u>R</u>ESPONSIVE <u>R</u>ECORDS AND THE <u>FBI</u>'S <u>P</u>RODUCTION**

**i.    <u>The FBI's Central Records System and Sentinel</u>**

Given that, by the FOIA Request, Plaintiff seeks records related to an individual subject to a criminal investigation, the FBI determined that responsive records would be located in its Central Records System ("<u>CRS</u>")—an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files that the FBI compiles and maintains.[3] Seidel Decl. ¶ 21.

The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  *Id.* ¶ 22.  The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as other categorical subjects.  *Id.*  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI office initiating the file, and (c) the assigned individual case file number for that particular subject matter.  *Id.*  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order in which the document is added to the file, typically in chronological order.  *Id.*

---

[2]    By agreement, the parties will only be litigating topics #1-10 and 13 of the FOIA Request in the summary judgment briefing.  *See* ECF No. 16, at ¶ 6.

[3]    The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI field offices, and FBI legal attaché offices worldwide.  Seidel Decl. ¶ 21.

The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. *Id.* ¶ 23. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to locate pertinent files reasonably and adequately in the performance of their law enforcement duties. *Id.* The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, and other subjects of investigative interest that are indexed for future retrieval. *Id.* The entries in the general indices fall into two categories:

> Main index entry. A main index entry is created for each individual or non-individual (*e.g.*, organization, event, or activity) that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.

> Reference index entry. A reference index entry is created for an individual or non-individual (*e.g.*, organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file.

*Id.* FBI personnel may index information in the CRS by individual, organization (entity, place, or thing), or event (*e.g.*, terrorist attack or bank robbery). *Id.* ¶ 24. FBI personnel index information in the CRS when information is deemed of sufficient significance to warrant indexing for future retrieval. *Id.* Accordingly, the FBI does not index every individual name or other subject matter in the general indices. *Id.*

As of July 2012,[4] information in the CRS can be accessed using Sentinel, the FBI's case management system. *See id.* ¶¶ 25, 26. FBI case records are created in, or uploaded to, the CRS and managed via Sentinel. *Id.* ¶ 25. The FBI relies on Sentinel daily to locate records and other documents to fulfill its essential functions. *Id.*

---

[4]    Before using Sentinel, the FBI relied on the Automated Case Support ("ACS") case management system. *Id.* ¶ 26.

ii.        **The FBI's Search Process – Generally and in This Case**

Upon receipt of a FOIA request, the FBI, via its Record/Information Dissemination Section ("RIDS"), conducts an index search in Sentinel using the name of the individual or non-individual who is the subject of the request.[5]  *Id.* ¶ 27.  Because the FBI's automated indices provide access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects, in most cases, a search of the CRS automated indices is the most reasonable means for the FBI to locate records potentially responsive to a FOIA request.  *Id.*  If the FBI determines that a search of Sentinel is unlikely to locate all indexed information, the FBI also conducts an index search of certain manual indices.  *Id.*

Although index searches are the way files are identified that may contain potentially responsive records, a FOIA analyst must nonetheless review potentially responsive records against the specific parameters of the individual FOIA request.  *Id.* ¶ 28.  Responsiveness determinations are made once the identified files are gathered, analyzed, and sorted by FOIA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.  *Id.*

In response to the FOIA Request, the FBI, via RIDS, conducted an index search of the CRS to identify files responsive to topics 1-10 and 13.  *Id.* ¶ 29.  Because of the nature of topics 9 and 10 of the FOIA Request, the FBI conducted additional searches, as described below.  *Id.*  The FBI interpreted the FOIA Request broadly as seeking records pertaining to Sanders and on which his name appears.  *Id.*

---

[5]        When the subject matter predates the implementation of Sentinel, the FBI generally begins its searching efforts by conducting an index search via the "ACS Search" function in Sentinel.  *Id.* ¶ 27.

          **a.**      ***Main File Search of the CRS***

The FBI conducted an index search of the CRS to identify potentially responsive records by searching Sentinel indices and ACS indices available through Sentinel using the search term "Zackary Sanders." *Id.* ¶ 30. As a result of these search efforts, the FBI located one responsive main file. *Id.* This file pertains to the criminal investigation that resulted in Sanders's criminal conviction and is responsive specifically to topics 1, 3, 4, 5, 6, 9, and 10 of the FOIA Request. *Id.* The FBI found no records responsive to topics 2, 7, 8, and 13 of the FOIA Request. *Id.*

          **b.**      ***Term Search of the CRS***

Because records containing the sets of terms listed in topic 9 were unlikely to be located through a CRS index search, the FBI conducted a term search of the CRS, specifically, via Sentinel, to locate any potentially responsive records using the following sets of terms from the FOIA Request:

- "an online bulletin board dedicated to the advertisement and distribution of child pornography that operated from approximately 2016 to June 2019"

- "associated to individuals who have accessed online Child Sexual Abuse and Exploitation material," and also in the same document includes the term "FLA"

- "A user of the Internet account at the SUBJECT PREMISES has been linked to an online community of individuals who regularly send and receive child pornography via a hidden service that operated on the Tor anonymity network"

- "a foreign law enforcement agency ('FLA') known to the FBI and with a history of providing reliable, accurate information in the past, notified the FBI" and also in the same document includes "accessed online child sexual abuse and exploitation material via a website"

- "The FLA described the website as having explicit focus on the facilitation of sharing child abuse material (images, links and videos)"

- "The FLA is a national law enforcement agency of a country with an established rule of law. There is a long history of U.S. law enforcement sharing criminal investigative information with the FLA and the FLA sharing criminal investigative information with

U.S. law enforcement, across disciplines and including the investigation of crimes against children"

- "The FLA advised U.S. law enforcement that it obtained information through independent investigation that was lawfully authorized in the FLA's country pursuant to its national laws"

- "The FLA further advised U.S. law enforcement that the FLA had not interfered with, accessed, searched, or seized any data from any computer in the United States in order to obtain that IP address information. U.S. law enforcement personnel did not participate in the investigative work through which the FLA identified the IP address information provided by the FLA"

- "18 (twinks) and younger"

*Id.* ¶ 31.  As a result of this search effort, the FBI located cross-reference files responsive to the FOIA Request, specifically topics 9(a) and 9(i).  *Id.*

### c.    *Targeted Search by the Criminal Investigative Division*

The FBI determined that topic 10 would likely encompass records that span multiple investigations, and that any such records were unlikely to be located through an index search of the CRS.  *Id.* ¶ 32.  As a result, in June 2021, the FBI requested that the FBI's Criminal Investigative Division ("CID")—specifically the Special Agent ("SA") assigned to the Sanders investigation—search for records potentially responsive to topic 10.  *Id.*

In July 2021, the CID SA advised that he had conducted a search within his FBINet and UNet email accounts, as well as a search of Sentinel, including the following terms: "declaration," "affidavit," "I, Christopher Ford," and "warrant."[6]  *Id.* ¶ 33.  As a result of these search efforts, the CID SA located 445 responsive pages of affidavits, declarations, and other types of investigative documents.  *Id.*  After reviewing the results from all its searches, the FBI determined that there is

---

[6]    As stated in Plaintiff's FOIA Request letter, dated April 1, 2021, Plaintiff limited topic 10 of the FOIA Request to only cases involving prosecutions under 18 U.S.C. §§ 2251, 2252, or 2253. *See* Seidel Decl. ¶ 5.

no indication responsive information resides in any other FBI system or location. *Id.* ¶ 34. There was thus (and is) no basis for the FBI to conclude that a search elsewhere could reasonably be expected to locate responsive records subject to the FOIA. *Id.*

### iii.      The Production of Responsive Documents and Administrative History

In April 2021, the FBI advised Plaintiff that the records he requested are in an investigative file exempt from disclosure under Exemption[7] 7(A). *Id.* ¶ 6. As a result, the FBI informed Plaintiff that the FOIA Request would be administratively closed. *Id.* Later that month, Plaintiff submitted an appeal to the Department of Justice ("DOJ"), Office of Information Policy ("OIP").[8] *Id.* ¶ 7.

By letter dated October 29, 2021, the FBI advised Plaintiff that it had completed its search for records responsive to topics 9, 10, and 13, and located records responsive to topics 9(a), 9(i), and 10 in a pending investigative file, which is exempt from disclosure under Exemption 7(A). *Id.* ¶ 12. The FBI advised Plaintiff that it had completed its review of these records for non-exempt, public source information and located thirty-two pages available for release. *Id.* The FBI also advised Plaintiff that it had reviewed at least 500 pages and released 185 pages in full, and withheld exempt information under Exemptions 6 and (7)(C) and under valid sealing orders from various district courts. *Id.* Searches of CRS did not locate responsive records for topics 9(b), 9(c), 9(d), 9(e), 9(f), 9(g), 9(h), and 13. *Id.*

By letter dated November 29, 2021, the FBI advised Plaintiff that it had reviewed 507 pages of records responsive to topics 9(a) and 9(i) and released thirty-four pages in part. *Id.* ¶ 13.

---

[7]      References to various "Exemptions" refer to the applicable subsection of 5 U.S.C. § 552(b).

[8]      Because Plaintiff filed the Complaint in Case No. 8:21-cv-01130-GJH on May 8, 2021, in July 2021, OIP advised Plaintiff of DOJ's regulations, *see* 28 C.F.R. § 16.8(b)(2), and stated that it will ordinarily not act on an appeal if a FOIA request becomes the subject of litigation, and thus OIP was closing Plaintiff's appeal. *Id.* ¶ 10.

Exempt material was withheld under Exemptions 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), and under valid sealing orders from various district courts. *Id.*

By letter dated December 29, 2021, the FBI advised Plaintiff that it had reviewed 501 pages of records responsive to topics 9(a) and 9(i), but was not releasing any responsive pages. *Id.* ¶ 15. Exempt material was withheld under Exemptions 6, 7(A), 7(C), 7(D), and 7(E). *Id.*

By letter dated January 31, 2022, the FBI advised Plaintiff that it had reviewed 275 pages of records responsive to topics 9(a) and 9(i) and released sixteen pages in full or in part. *Id.* ¶ 16. Exempt material was withheld under Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E), and under valid sealing orders from various district courts. *Id.*

By letter dated February 28, 2022, the FBI advised Plaintiff that it had reviewed three pages of records responsive to topic 9(i), but was not releasing any responsive pages. *Id.* ¶ 17. Exempt material was withheld under Exemptions 6, 7(A), 7(C), 7(D), and 7(E). *Id.* Additionally, the FBI advised Plaintiff that appropriate withholdings were made by the FBI and Immigration and Customs Enforcement ("ICE"). *Id.*

By letter dated March 29, 2022, the FBI advised Plaintiff that it had reviewed eighteen pages of records responsive to topics 9(a) and 9(i), but was not releasing any responsive pages. *Id.* ¶ 18. Exempt material was withheld under Exemptions 5, 7(A), and 7(E). *Id.* Additionally, the FBI advised Plaintiff that appropriate withholdings were made by the FBI and the Executive Office for United States Attorneys ("EOUSA"). *Id.*

By letter dated May 5, 2022, the FBI advised Plaintiff that it had completed its search for records responsive to topics 1-8 and located records responsive to topics 1 and 3-6 in a pending investigative file, and these records had been processed in response to FBI FOIPA Request

Number 1494409-000, which is subject to litigation in the Middle District of Florida.[9]  *Id.* ¶ 19; *see also id.* ¶¶ 12 n.5, 30.  The FBI advised Plaintiff that it completed its review of the records for applicable underlying FOIA exemptions and asserted Exemptions 3, 5, 6, 7(C), 7(D), and 7(E), and withholdings due to valid sealing orders from various district courts.  *Id.*  The FBI advised that it had located forty-three pages of non-exempt, public source information in these records available for release.  *Id.*

By letter dated September 16, 2022, the FBI advised Plaintiff that it had re-reviewed seventy-three pages of records responsive to topics 9(a) and 9(i) and released forty-six pages in full or in part.  Exempt material was withheld under Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E), and under valid sealing orders from various district courts.  The FBI advised that these records had been re-reviewed because Exemption 7(A) no longer applies to certain records and certain records are no longer subject to a sealing order  *Id.* ¶ 20.

### C.    THE COMPLAINT, THE DOCUMENT RELEASES, AND THE NARROWING OF ISSUES FOR SUMMARY JUDGMENT

On May 8, 2021, Plaintiff filed a *Complaint* (the "<u>1130 Complaint</u>"), commencing Case No. 8:21-cv-01130-GJH (the "<u>1130 Case</u>").   In the 1130 Complaint, Plaintiff challenged Defendant's invocation of Exemption 7(A) as for the FOIA Request.  In the 1130 Complaint, Plaintiff challenged only Defendant's invocation of Exemption 7(A) as for topics 9, 10, 13, and 14 of the FOIA Request.  *See* 1130 Complaint, at ¶ 6.

On October 13, 2021, Plaintiff filed another *Complaint* (the "<u>2625 Complaint</u>," and together with the 1130 Complaint, the "<u>Complaints</u>"), commencing Case No. 8:21-cv-02625-TDC (the "<u>2625 Case</u>, and together with the 1130 Case, the "<u>Cases</u>").  In the 2625 Complaint, Plaintiff

---

[9]    *See Danielle Smith v. USDOJ*, No. 8:21-cv-01291 (M.D. Fla. May 27, 2021).

again challenged Defendant's invocation of Exemption 7(A) as for the FOIA Request, but specifically challenged that invocation as for topics 1-8.  *See* 2625 Complaint, at ¶ 6.

On December 1, 2021, the Court entered the *Order Granting Consent Motion to Consolidate Cases*, *see* ECF No. 14, consolidating the Cases.

As discussed above, by agreement, the parties are only litigating topics 1-10 and 13 of the FOIA Request.  *See* ECF No. 16, at ¶ 6.

## III.    STANDARD OF REVIEW:  SUMMARY JUDGMENT UNDER RULE 56(a)

Summary judgment is appropriate when "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' based on the 'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … , admissions, interrogatory answers, or other materials.'"  *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013) (quoting FED. R. CIV. P. 56(a), (c)).  An issue of fact is "genuine" only if the evidence is such that a reasonable factfinder could find for the non-moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" only if it could affect the outcome of the case under the applicable governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The mere existence of some alleged factual dispute in the case, however, will not defeat an otherwise properly supported summary judgment motion.  *See id.* at 247-48.

Once the movant presents a properly supported motion for summary judgment, the burden shifts to the non-movant to set forth specific facts, through affidavits or other evidence, that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e).  The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

11

FOIA cases are generally resolved on summary judgment. *See Am. Mgmt. Servs., LLC v. Dep't of the Army*, 842 F. Supp. 2d 859, 866 (E.D. Va. 2012), *aff'd*, 703 F.3d 724 (4th Cir. 2013); *Moore v. United States*, No. 1:13-cv-02353, 2014 WL 2575765, at *2 (D. Md. June 6, 2014).  To prevail on a summary judgment motion, the agency must prove that it conducted an adequate search for responsive records and that each responsive record was either produced to the plaintiff or exempt from disclosure. *See Nicholas v. NSA*, No. 1:05-cv-02800, 2006 WL 4071922, at *1 (D. Md. May 11, 2006); *see also Taitz v. Astrue*, 806 F. Supp. 2d 214, 217 (D.D.C. 2011).

To meet its burden, the Government may rely on reasonably detailed and nonconclusory affidavits or declarations. *Freeman v. DOJ*, 808 F.2d 834, 834 (4th Cir. 1986) (Table).  To establish the adequacy of a search, an agency may provide a reasonably detailed affidavit that sets forth the "type of search performed, and averring that all files likely to contain responsive materials … were searched." *Clay v. DOJ*, No. 1:09-cv-00179, 2010 WL 325587, at *3 (D.D.C. Jan. 29, 2010) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *see also In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 98 (D.D.C. 2008) ("To meet its burden, the agency may submit affidavits or declarations that explain both in reasonable detail and in a non-conclusory fashion the scope and method of the agency's search.").  In considering the agency's submissions, the Fourth Circuit has explained that "[i]t is imperative that the court consider and accord 'substantial weight to the expertise of the agencies charged with determining what information the government may properly release.'" *Bowers v. DOJ*, 930 F.2d 350, 357 (4th Cir. 1991) (quoting *Simmons v. DOJ*, 796 F.2d 709, 711 (4th Cir. 1986)); *see Havemann v. Astrue*, No. 1:10-cv-01498, 2012 WL 4378143, at *4 (D. Md. Sept. 24, 2012) (stating that such affidavits are "entitled to a presumption of good faith") (internal citation and quotation marks omitted); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) ("Agency affidavits are accorded a

presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.").

If an agency has redacted information or withheld documents in response to a FOIA request, the agency must show that it properly invoked any FOIA exemptions. *See* 5 U.S.C. § 552(a)(4)(B); *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The agency can satisfy its burden through affidavits, declarations, a *Vaughn*[10] index, or other evidence showing that the information is exempt from disclosure. *See, e.g.*, *Bowers*, 930 F.2d at 357 ("If the government fairly describes the content of the material withheld and adequately states its ground for nondisclosure, and if those grounds are reasonable and consistent with the applicable law, a district court should uphold the government's position.") (quoting *Spannaus v. DOJ*, 813 F.2d 1285, 1289 (4th Cir. 1987)). "To prevail over this presumption a requestor must demonstrate a material issue by producing evidence, through affidavits or other appropriate means, contradicting the adequacy of the search or suggesting bad faith." *Havemann v. Colvin*, 629 F. App'x 537, 539 (4th Cir. 2015).

Defendant's declarant for the FBI—the main player in this case—is Michael G. Seidel, the Section Chief of RIDS, where he has worked for nearly a decade. *See* Seidel Decl. ¶ 1. In his various roles at the FBI, Mr. Seidel has had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act litigation cases nationwide. *Id.* Further, Mr. Seidel

---

[10]    *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). There is no set formula for a *Vaughn* index. "[I]t is well established that the critical elements of the *Vaughn* index lie in its function, and not in its form." *Kay v. FCC*, 976 F. Supp. 23, 35 (D.D.C. 1997). "A *Vaughn* index must: (1) identify each document withheld; (2) state the statutory exemption claimed; and (3) explain how disclosure would damage the interests protected by the claimed exemption." *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1326 n.1 (9th Cir. 1995). "Of course, the explanation of the exemption claim and the descriptions of withheld material need not be so detailed as to reveal that which the agency wishes to conceal, but they must be sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under FOIA." *Founding Church of Scientology of Washington, D.C. v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

manages approximately 242 employees, who, in turn, staff ten FBI headquarters units and two field operational service units whose collective mission is to plan, develop, direct, and manage effectively responses to FOIPA requests directed to the FBI. *See id.* ¶ 2. The Seidel Declaration describes the details of Defendant's search for documents response to the FOIA Request and the justifications for withholding and redacting certain information. Defendant has also prepared a *Vaughn* index, a copy of which is attached as Exhibit N to the Seidel Declaration. The *Vaughn* index includes, for each record, the start and end page, the number of pages per record, a description of each record, and, along with the Seidel Declaration, a particularized explanation of the withheld information.

## IV.   <u>ARGUMENT</u>

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Casa de Md., Inc. v. U.S. Dep't of Homeland Sec.*, 409 F. App'x 697, 699 (4th Cir. 2011) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). Thus, under FOIA, when a person or entity makes a specific and reasonable request for records from a federal agency, the agency must make the responsive records available. *See* 5 U.S.C. § 552(a)(3)(A); *Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 728 (4th Cir. 2013). Because public disclosure may not always be in the public interest, however, FOIA contains nine exemptions designed to safeguard various public interests against the harms that would arise from overbroad disclosure. *See Am. Mgmt. Servs., LLC*, 703 F.3d at 728-29 (internal citation and quotation marks omitted). Although courts narrowly construe the nine FOIA exemptions, "even such narrow construction does not imply that disclosure is always called for." *Sung Bal Cho v. USDA*, No. 1:05-cv-01456, 2006 WL 8456574, at *2 (D. Md. May 3, 2006).

Based on the record, Defendant's actions in responding to the FOIA Request are fully justified and, as a result, the Court should grant the Motion. The Seidel Declaration, and the related declarations from other federal agencies and DOJ components, comprehensively articulates the search Defendant conducted for responsive records and the descriptions of and justifications for the information Defendant withheld under Exemptions 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), and under valid sealing orders from various district courts.[11]

### A.    DEFENDANT CONDUCTED A REASONABLE SEARCH

The FBI has submitted a detailed declaration demonstrating that it conducted a reasonable search for responsive records, and is therefore entitled to summary judgment on this issue. An agency is entitled to summary judgment on the adequacy of its search if it demonstrates that it made a "'good faith effort to conduct a search ... using methods which can be reasonably expected to produce the information requested." *Manivannan v. Dep't of Energy, Nat'l Energy Tech. Lab.*, 843 F. App'x 481, 483 (4th Cir. 2021) (quoting *DiBacco v. Dep't of the Army*, 926 F.3d 827, 832 (D.C. Cir. 2019)). "There is no requirement that an agency search every record system." *Goldner v. SSA*, 293 F. Supp. 3d 540, 546 (D. Md. 2017) (quoting *Oglesby*, 920 F.2d at 68). Indeed, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the [FOIA] request, but rather whether the search for those documents was adequate." *Rein v. USPTO*, 553 F.3d 353, 363 n.14 (4th Cir. 2009) (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). The search is thus evaluated "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Ayyad v. IRS*, No. 8:16-cv-03032,

---

[11]    Although the analysis below focuses on the various FOIA exemptions, Defendant properly withheld various responsive records that remain sealed by various district courts. *See* Seidel Decl. ¶ 123. As explained in the Seidel Declaration, the FBI confirmed via PACER that the pertinent records remain sealed, and confirmed its findings by contacting each of the district courts that issued a sealing order. *See id.*

2018 WL 704849, at *4 (D. Md. Feb. 2, 2018) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

An agency can obtain summary judgment as to the adequacy of its search by submitting "reasonably detailed, nonconclusory affidavits describing its efforts." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006). "When the adequacy of a search is challenged, an agency may demonstrate the adequacy of its search by submitting an affidavit that is 'reasonably detailed, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched so as to give the requesting party an opportunity to challenge the adequacy of the search.'" *Taitz v. Colvin*, No. 1:13-cv-01878, 2013 WL 6623196, at *2 (D. Md. Dec. 13, 2013) (quoting *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1246-47 (4th Cir. 1994)). This standard is not demanding. "[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice ...." *Lindsey v. NSA*, No. 90-2408, 1990 WL 148422, at *2 (4th Cir. Oct. 9, 1990) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).

Here, the Seidel Declaration demonstrates that the FBI conducted a thorough and reasonable search for responsive records. As the FBI's declarant explains, the FBI's search had several components:

1.      The FBI interpreted Plaintiff's request broadly as seeking records pertaining to Sanders and those on which his name appears, Seidel Decl. ¶ 29, and conducted an index search of the CRS using Sentinel and the ACS search function in Sentinel—where the FBI determined would be the location reasonably likely to house responsive records—using the search term "Zackary Sanders." *See id.* ¶¶ 21, 30. The CRS is an extensive system of records consisting of

applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI, and the system spans the entire FBI organization. *See id.* Further, because records containing the sets of terms listed in topic 9, with all of its subparts, would not likely be located through a CRS index search, the FBI conducted term searches to locate records potentially responsive to topic 9 using another nine sets of terms. *See id.* ¶ 31. Indeed, by these searches, the FBI discovered records responsive to topics 1, 3, 4, 5, 6, 9, and 10. *See id.* ¶¶ 30, 31; *see also Gizmodo Media Grp., LLC v. FBI*, 366 F. Supp. 3d 585, 590 (S.D.N.Y. 2019) ("Courts have repeatedly upheld index searches of [the] CRS to be adequate when they are supported by detailed declarations explaining the underlying systems and the search procedures used.").

2.      But the FBI did even more. Because it determined that the records Plaintiff sought in topic 10 would likely encompass multiple investigations (and unlikely to be located through a CRS index search), the FBI directed the CID SA assigned to the Sanders investigation to search multiple email accounts and Sentinel using the broad terms "declaration," "affidavit" "I, Christopher Ford," and "warrant." Seidel Decl. ¶¶ 32, 33. Indeed, by these searches, the FBI located another 445 pages of documents potentially responsive to topics 9(a), 9(c), 9(d), 9(e), 9(f), 9(g), 9(h), 9(i), and 10. *See id.* ¶ 33 n.39.

3.      After reviewing the results from these various searches, the FBI determined that there is no indication that responsive information resides in any other FBI system or location. *See id.* ¶ 34.

The Seidel Declaration provides a reasonably detailed explanation of the FBI's search efforts, including the methods and search terms employed, the locations searched, and the rationale for choosing those locations. *See* Seidel Decl. ¶¶ 21-34. The Seidel Declaration demonstrates that the FBI's search was reasonably calculated to locate all responsive records. Defendant is entitled

17

to summary judgment as to the adequacy of its search.  *See, e.g.*, *Charnock v. Barr*, No. 1:18-cv-00676, 2019 WL 3238581, at *3 (D.D.C. July 18, 2019) (holding that the DOJ's "declaration supports the adequacy of [its] search by providing the specific search term used, the files searched, and an explicit declaration that all files likely to contain responsive records were searched"); *see also Mobley v. CIA*, 806 F.3d 568, 584 (D.C. Cir. 2015) (finding the FBI's search of the CRS to be adequate because of, in part, an agency declaration asserting that the FBI's search was "reasonably likely to produce the information [plaintiff] requested").

### B.   DEFENDANT PROPERLY ASSERTED VARIOUS FOIA EXEMPTIONS

### i.   Defendant Properly Asserted Exemption 7(A)

As a threshold matter, to fall within any of the exemptions under the umbrella of Exemption 7, a record must have been "compiled for law enforcement purposes." *Pub. Emps. for Env't Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 202-03 (D.C. Cir. 2014).  In determining whether records are compiled for law enforcement purposes, courts within the D.C. Circuit have "long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted).  This is not a burdensome exercise.  Documents are "compiled for law enforcement purposes" if they were, for example, "created to prevent crime and keep people safe," *Elec. Privacy Info. Ctr. v. DHS*, 777 F.3d 518, 522-23 (D.C. Cir. 2015), "deter illegal activity and ensure national security," *Sack v. DOD*, 823 F.3d 687, 694 (D.C. Cir. 2016), or otherwise show a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal

law." *See Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

Here, broadly speaking, the responsive records here were compiled for law enforcement purposes. For one, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to the national security, and to further the foreign intelligence objectives of the United States. *See* Seidel Decl. ¶ 41. The records Plaintiff seeks concern an investigation into Sanders's violations of federal crimes related to child pornography—crimes of which Plaintiff was convicted in October 2021. *See id.* Because the records Plaintiff seeks relate to the FBI's criminal investigations of individuals for child pornography crimes, and further because the FBI assisted local law enforcement agencies in their related investigations, *see id.* ¶ 42, there is a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible … violation of federal law." *See Blackwell*, 646 F.3d at 40. As a result, the records Plaintiff seeks in the FOIA Request were compiled for law enforcement purposes, and thus meet the threshold requirement for invocation of any of the exemptions under the Exemption 7 umbrella.

Exemption 7(A) prevents the disclosure of law enforcement records that "could reasonably be expected to interfere with enforcement proceedings …." 5 U.S.C. § 552(b)(7)(A). To invoke this exemption, an agency must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Citizens for Responsibility & Ethics in Wash. (CREW) v. USDOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Mapother v. USDOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)). The exemption is

19

intended to "prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations." *Maydak v. USDOJ*, 218 F.3d 760, 762 (D.C. Cir. 2000). "An agency may 'satisfy its burden of proof' under Exemption 7(A) 'by grouping documents in categories and offering generic reasons for withholding documents in each category.'" *Shapiro v. DOJ*, No. 1:12-cv-00313, 2020 WL 3615511, at \*16 (D.D.C. July 2, 2020) (quoting *Maydak*, 218 F.3d at 765). An agency's task under this approach is three-part: "the agency (1) must define its categories functionally; (2) must conduct a document-by-document review in order to assign documents to the proper category; and (3) must explain to the court how the release of each category would interfere with enforcement proceedings." *Shapiro*, 2020 WL 3615511, at \*16 (cleaned up).

Defendant has satisfied this three-part approach. *First*, in the Seidel Declaration, Defendant "define[s] its categories functionally," *see id.*, without providing a document-by-document description of the records within the investigative file, as doing so would undermine the interests that the FBI seeks to protect under Exemption 7(A). *See* Seidel Decl. ¶ 49. Without enumerating them here, in the Seidel Declaration, Defendant identifies nineteen separate "types of records." *See id.* ¶ 49(a)-(s). But beyond that, Defendant explains each type of record, beyond mere labels, *see id.*, and further distills those categories down into sub-categories (and sub-sub categories), *i.e.*, Administrative Material, Evidentiary and Investigative Material, each with its own further explanation for the types of information and documents likely to be included. *Id.* ¶ 53.

*Second*, the Seidel Declaration confirms that "the FBI conducted a document-by-document review of the responsive records, using an automated review process, to confirm the applicability of Exemption 7(A) and to assess the applicability of underlying exemptions." *Id.* ¶ 48.

And *third*, in the Seidel Declaration, Defendant explains how the release of each category would interfere with enforcement proceedings. First, the FBI conferred with the SA assigned to the Sanders investigation, who confirmed that release of the responsive records would interfere with ongoing proceedings in Sanders's criminal case (sentencing, appeal, *etc.*), and further confirmed that the responsive records are part of ongoing investigations of third parties, and the release of the requested information could interfere with those proceedings. *Id.* ¶¶ 47 n.45, 51. More specifically,

> While the pending investigative records at issue pertain to the investigation of Sanders, the information also pertains to investigations of third-party individuals, disclosure of which would reveal the scope of the FBI's investigative efforts. More specifically, release of these records would allow these third-party individuals to critically analyze documents concerning these investigations. Such individuals would then possess the unique advantage of prematurely knowing the details surrounding the investigation of their criminal activities, including the identity of victims and direct and circumstantial evidence gathered during the investigation. These individuals could use the released information to their advantage to alter or destroy evidence, create false evidence, harass or otherwise intimidate victims and others, such as witnesses, or evade the FBI's investigative efforts. In this regard, release of information in the records would potentially harm the government's investigative and enforcement efforts, thus reducing the likelihood of prosecution of the investigative subjects for their crimes, which involve the exploitation of children.

*Id.* ¶ 51. Moreover, the Seidel Declaration provides specific explanations for how the release of each category of documents would interfere with enforcement proceedings. Without listing them all here, the Seidel Declaration explains that disclosing certain "Reporting Communications" "may reveal or confirm the FBI's cooperation with foreign, other federal, state, or local government or law enforcement agencies in the investigation"; and that releasing certain "Administrative Instructions" "would permit subjects to anticipate and possibly alter or negate incriminating evidence, which could stymie future enforcement efforts." *Id.* ¶ 53.A.

Because Defendant can establish that the responsive documents were compiled for law enforcement purposes, and that it satisfies the three-part approach for invoking Exemption 7(A), Defendant has properly invoked Exemption 7(A). *See, e.g.*, *Pinson v. USODJ*, 177 F. Supp. 3d 56, 86 (D.D.C. 2016) (granting the Government summary judgment on its invocation of Exemption 7(A) where the FBI provided "a declaration detailing the pending law enforcement proceeding, categories of exempt documents, and reasons explaining why release of these documents would interfere with the proceedings").

### ii. Defendant Properly Asserted Other Underlying Exemptions

Because Defendant establishes that Exemption (7)(A) applies to all the information withheld in this case, the Court need not continue its analysis of the underlying exemptions—the non-public information is already properly withheld under the categorical (7)(A) exemption. But in an abundance of caution, and if the Court disagrees that records were properly withheld under Exemption (7)(A), the FBI also asserts other FOIA exemptions, described below. Because Defendant's assertions of these exemptions are "logical or plausible," the Court should sustain them. *See Igoshev v. NSA*, No. 1:17-cv-01363, 2018 WL 2045530, at *7 (D. Md. May 1, 2018) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

### a. *Exemption 3*

5 U.S.C. § 552(b)(3) exempts from disclosure information which is:

specifically exempted from disclosure by statute … if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph.

As one court explained:

The Supreme Court has set forth a two-part analysis for courts reviewing an agency's invocation of Exemption 3. *CIA v. Sims*, 471 U.S. 159, 167 … (1985).

> First, the court must determine whether the statute designated by the withholding agency is one properly within the bounds of Exemption 3. *See id.* If so, the court must then determine whether the withheld information meets the requirements of that statute. *See id.*

*Roman v. NSA*, No. 2:07-cv-4502, 2009 WL 303686, at *5 (E.D.N.Y. Feb. 9, 2009). Here, the FBI withheld information under Exemption 3 under multiple statutes and rules: (i) Rule 6(e) of the Federal Rules of Criminal Procedure; (ii) the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509; (iii) the Pen Register Act, 18 U.S.C. § 3123(d); and (iv) the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). Defendant properly invoked Exemption 3 under these statutes and rules.

*First*, the Seidel Declaration demonstrates that these statutes and rules are within the bounds of Exemption 3, and various cases have so held. *See McCoy v. United States*, No. 1:04-cv-00101, 2006 WL 463106, at *7 (N.D. W. Va. Feb. 24, 2006) (recognizing "long ago that requests for documents related to grand jury investigations implicate FOIA's third exemption") (quoting *Lopez v. DOJ*, 393 F.3d 1345, 1349 (D.C. Cir. 2002)); *Gatson v. FBI*, No. 2:15-cv-05068, 2017 WL 3783696, at *10 (D.N.J. Aug. 31, 2017) (holding that the Pen Register Statute and Child Victims' and Child Witnesses' Act are within the purview of Exemption 3); *CIA v. Sims*, 471 U.S. 159, 168 (1985) (holding that the National Security Act "qualifies as a withholding statute under Exemption 3").

*Second*, the Seidel Declaration demonstrates that the information requested falls within the scope of these statutes or rules. *See* Seidel Decl. ¶¶ 55-62. As a result, Defendant properly applied Exemption 3 to these records.

### b.  *Exemption 5*

Exemption 5 protects from mandatory disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in

litigation with the agency ….."  5 U.S.C. § 552(b)(5).  "Among the privileges incorporated by FOIA Exemption 5 are the deliberative process privilege, the attorney work product privilege, and the attorney-client privilege."  *Judicial Watch, Inc. v. HUD*, 20 F. Supp. 3d 247, 256 (D.D.C. 2014) (internal quotation marks omitted); *see also Judicial Watch, Inc. v. U.S. Dep't of State*, 349 F. Supp. 3d 1, 6 (D.D.C. 2018) ("Exemption 5 unequivocally incorporates all civil discovery rules, including the attorney-client and deliberative process privileges.").  Defendant properly asserted the deliberative process privilege (the "DPP") and attorney work product privilege.

## I.    Deliberative Process Privilege

Exemption 5 incorporates the DPP, which "encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbinding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions but for matters they considered before making up their minds."  *City of Va. Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1252-53 (4th Cir. 1993) (cleaned up).  The DPP protects materials that are both pre-decisional and deliberative.  *Id.* at 1253. A "pre-decisional" document is one "prepared in order to assist an agency decision maker in arriving at his decision."  *Ethyl Corp.*, 25 F.3d at 1248 (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  A document is part of the "deliberative process" if "the disclosure of [the] materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987); *City of Va. Beach*, 995 F.2d at 1253 (holding that a document is deliberative if it "reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates the possible alternative policies or outcomes") (internal citation and

quotation marks omitted). The DPP thus protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *City of Va. Beach*, 995 F.2d at 1253 (internal citation and quotation marks omitted). Even factual materials may be encompassed within the privilege. *See Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988) (quoting *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 68 (D.C. Cir. 1974)).

Here, the FBI asserted the DPP to protect handwritten, investigative interview notes, as well as draft affidavits and draft pen register and trap-and-trace documents. Seidel Decl. ¶¶ 66-71. As described in the Seidel Declaration, these materials reflect deliberations integral to reaching final agency decisions. *See id.* ¶ 67. Moreover, the Seidel Declaration details the foreseeable harm to the Government if it had to disclose the handwritten, investigative interview notes, as well as draft affidavits and draft pen register and trap-and-trace documents. *See id.* ¶¶ 69, 71. Defendant properly asserted the DPP.

## II.    Attorney Work Product Privilege

"To be considered attorney work product, a document must have been 'prepared by an attorney in contemplation of litigation which set[s] forth the attorney's theory of the case and his litigation strategy.'" *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 292 (4th Cir. 2004) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975)). As one district court explained:

> In applying the work product doctrine, the D.C. Circuit has instructed that, it "should be interpreted broadly and held largely inviolate." *Judicial Watch v. U.S. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005). This is consistent with the policy underpinnings articulated by the Supreme Court that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 … (1947). The work-product doctrine can apply to preparatory work performed not only by attorneys, but also, in some circumstances by nonlawyers, *United States v.*

25

*Nobles*, 422 U.S. 225, 238-239 … (1975), and "does not distinguish between factual and deliberative material," *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987). This is because, in the context of work product, the risk is apparent that an attorney's discussion of factual matters may reveal his or her tactical or strategic thoughts. *See Mervin v. FTC*, 591 F.2d 821, 825-26 (D.C. Cir. 1978) (noting that "even the factual material segregated from attorney work-product is likely to reveal some of the attorney's tactical and strategic thoughts" and that while "pure statements of fact" are not exempt "from disclosure by calling them attorney work-product ... material which might disclose an attorney's appraisal of factual evidence is attorney work-product exempted from disclosure by exemption 5"). Thus, "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5." *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997).

Moreover, in the FOIA context, the temporal relationship between the document at issue and the litigation for which the document was prepared is irrelevant. As the Supreme Court held in [*FTC v.*] *Grolier* [*Inc.*], 462 U.S. [19,] … 28 (1983)], "under Exemption 5, attorney work-product is exempt from mandatory disclosure without regard to the status of the litigation for which it was prepared. Only by construing Exemption 5 to provide a categorical rule can the Act's purpose of expediting disclosure by means of workable rules be furthered." As a consequence, work product materials may enjoy protection not only "when the litigation with regard to which the work product was prepared is still in progress," *id.*, but also when that claim has been resolved. *Id.* at 29 ….

*Shapiro v. USDOJ*, 969 F. Supp. 2d 18, 28-29 (D.D.C. 2013).

Here, Defendant asserted the attorney work product privilege to protect draft affidavits in support of an application for a search warrant, which materials were created in anticipation of litigation. Seidel Decl. ¶ 73. Moreover, the Seidel Declaration details the foreseeable harm to the Government if it had to disclose the draft affidavits in support of an application for a search warrant. *See id.* ¶ 74. Defendant properly asserted the attorney work product privilege. *See, e.g.*, *Borda v. USDOJ*, 306 F. Supp. 3d 306, 320 (D.D.C. 2018) ("Recent cases have generally held that draft affidavits ... are covered by the work-product rule ….") (cleaned up).

c.      *Exemptions 6 and 7(C)*

"FOIA Exemptions 6 and 7(C) seek to protect the privacy of individuals identified in certain agency records." *Am. Civil Liberties Union v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). Exemption 7(C) authorizes withholding of records compiled for law enforcement purposes if their release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). This exemption requires the agency to balance the individual's privacy rights against the public interest in disclosure. *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989).

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For this exemption to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). The agency then balances the individual's right to privacy against the public's interest in disclosure. *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

Courts broadly construe the privacy interests protected by Exemptions 6 and 7(C). *See Reporters Comm. for Freedom of the Press*, 489 U.S. at 763. For example, although the names of government employees are not categorically protected, there is still a strong presumption against release. *See Cooper v. DOJ*, 169 F. Supp. 3d 20, 36 (D.D.C. 2016). "Generally, government employees and officials, especially law enforcement personnel, have a privacy interest in protecting their identities because disclosure 'could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.'" *Moore v. Bush*, 601 F. Supp. 2d 6, 14 (D.D.C. 2009) (quoting *Halpern v. FBI*, 181 F.3d 279, 296-97 (2d Cir. 1999)).

Here, Defendant has withheld under Exemptions 6 and 7(C) names and other identifying information of several categories of individuals: (i) third parties who provided information; (ii) FBI special agents and professional staff; (iii) individuals of investigative interest; (iv) local law enforcement personnel; (v) third party victims; (vi) personnel from non-FBI, federal governmental agencies; and (vii) third parties merely mentioned.  Seidel Decl. ¶¶ 78-88.  Moreover, the Seidel Declaration outlines, for each category of individuals, how it weighed the individual's privacy interests against any public interest in disclosure.  *See id.*  Summary judgment as to Defendant's Exemption 6 and 7(C) claims is therefore warranted.  *See, e.g.*, *Webster v. USDOJ*, No. 1:02-cv-00603, 2020 WL 1536303, at *6-7 (D.D.C. Mar. 31, 2020) (upholding the FBI's invocation of Exemption 7(C), for, among other things, "third parties who were interviewed and/or provided information to the FBI during the course of its investigation of the subject and other third parties," "state and local law enforcement personnel," "third parties who were merely mentioned in the criminal investigative files responsive to Plaintiffs' request," "third parties who were of investigative interest to the FBI," and FBI special agents and "FBI support employees"); *Gatson*, 2017 WL 3783696, at *11 (upholding the FBI's invocation of Exemptions 6 and 7(C) for, among other things, "non-FBI federal, state and local government employees … [and] third-party victims").

### iii.    <u>Defendant Properly Asserted Exemption 7(D)</u>

Exemption 7(D) permits the withholding of information in law enforcement records, the release of which "could reasonably be expected to disclose the identity of a confidential source … and, in the case of a record or information compiled … in the course of a criminal investigation or … national security intelligence investigation, information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  This exemption requires no balancing of public and private interests.  *See*

*Dow Jones & Co. v. DOJ*, 917 F.2d 571, 577 (D.C. Cir. 1990). If the agency "can demonstrate that the information was provided in confidence," then "the source will be deemed a confidential one, and both the identity of the source and the information he or she provided will be immune from FOIA disclosure." *Id.* at 575-76 (cleaned up). This exemption applies to protect the identity of a source if an agency establishes that a source has provided information under either an express or implied promise of confidentiality. *See Williams v. FBI*, 69 F.3d 1155, 1159-60 (D.C. Cir. 1995).

Here, Defendant withheld the names and other identifying information of and information provided (outside of its investigative use) by individuals and foreign government and law enforcement entities under an express assurance of confidentiality. Seidel Decl. ¶¶ 90-97. As for the individuals, the FBI found evidence that certain individuals either requested that their identity not be revealed or FBI investigators, would have, by standard practice, expressly promised them that their identity and the information provided (outside of its investigative use) would remain confidential. *Id.* ¶¶ 92-94. As for foreign entities, the FBI has long-standing agreements with certain foreign government entities by which it will keep confidential information the agencies provide (outside of its investigative use) and the identities of the agencies and their staff. *Id.* ¶ 96. As a result, Defendant properly applied Exemption 7(D) to these records. *See, e.g.*, *Shapiro*, 2020 WL 3615511, at *33-35 (upholding the FBI's invocation of Exemption 7(D) for, among other things, "names, identifying data and/or information provided by individuals under implied assurances of confidentiality" "names, identifying information about, and/or information provided by sources under express assurances of confidentiality," and foreign government agency information under an express assurance of confidentiality).

###### iv.    **Defendant Properly Asserted Exemption 7(E)**

Exemption 7(E) protects from mandatory disclosure records or information compiled for law enforcement purposes if release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Exemption 7(E) "protects law enforcement agencies from being required to provide information that might help criminals avoid apprehension." *Epps v. DOJ*, 801 F. Supp. 787, 795 (D.D.C. 1992), *aff'd in part and vacated in part*, 995 F.2d 305 (D.C. Cir. 1993) (Table). As one court explained:

> Exemption 7(E) sets a relatively low bar for the agency to justify withholding: Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.

*Gluckman v. U.S. Dep't of Labor*, No. 3:13-cv-00169, 2013 WL 6184957, at *5 (E.D. Va. Nov. 26, 2013) (quoting *Blackwell*, 646 F.3d at 42).

Here, Defendant asserts Exemption 7(E) to protect these categories of information: (i) internal FBI email addresses and nonpublic web addresses and telephone numbers; (ii) database information and search results; (iii) tactical information contained in operational plans; (iv) focus of specific investigations; (v) collection and analysis of information; (vi) specific law enforcement technique utilized to conduct national security investigations; (vii) targets of pen registers and trap-and-trace devices; (viii) Computer Analysis Response Team reports and data; (ix) undercover operations; (x) types and timing of investigations; (xi) surveillance techniques; and (xii) sensitive investigative file numbers and sub-file names. Seidel Decl. ¶¶ 99-122. As explained more fully in the Seidel Declaration, release of this information would give criminals insight into FBI tools

and resources to conduct its investigations and how to avoid them.  *See generally id.*  Many cases

have so held.  *See, e.g.*, *Shapiro*, 2020 WL 3615511, at *35-40 (upholding the FBI's invocation of

Exemption 7(E) for, among other things, "database information and/or printouts," "undercover

operations," "investigative focus of specific investigations," "database information and/or

printouts," "a specific law enforcement technique utilized to conduct national security

investigations," "dates and/or types of investigations," and "sensitive file numbers or subfile

names"); *Viola v. USDOJ*, 306 F. Supp. 3d , 332-33 (D.D.C. 2018) (holding the FBI's invocation

of Exemption 7(E) for, among other things, "targets of pen registers/trap and trace devices;

undercover operations; and internal FBI email and IP addresses").  As a result, Defendant properly

applied Exemption 7(E) to these records.  *See Gatson*, 2017 WL 3783696, at *12-15 (upholding

the FBI's invocation of Exemption 7(E) to, among other things, "tactical information contained in

operational plans" and "computer analysis response team reports and data"); *O'Brien v. DOJ*, No.

2:20-cv-00092, 2022 WL 2651850, at *9 (E.D. Pa. July 8, 2022) (upholding the FBI's invocation

of Exemption 7(E), to, among other things, "surveillance techniques and information on

surveillance targets and locations").

#### v.    **The IRS Properly Asserted Exemption 3**

The FBI consulted with the Internal Revenue Service (the "IRS") about certain records

responsive to the FOIA Request, specifically, tax returns of third-party individuals.  *See* Seidel

Decl. ¶¶ 124, 125.  The IRS asserted Exemption 3 as for third-party tax returns, citing 26 U.S.C.

§ 6103(a), which generally provides that tax "[r]eturns and return information shall be confidential

…."  *See* Seidel Decl. ¶ 125; Declaration of Jee Eun Ahn (the "Ahn Decl.")[12] ¶¶ 7, 8.  The IRS

properly asserted Exemption 3 as for third-party tax information.  *See Solers, Inc. v. IRS*, 827 F.3d

---

[12]    A copy of the Ahn Decl. is attached as Exhibit O to the Seidel Declaration.

323, 331 (4th Cir. 2016) (recognizing that Section 6103 is "a statute contemplated by FOIA Exemption 3") (internal citation and quotation marks omitted); *Judicial Watch, Inc. v. Rossotti*, No. 1:01-cv-02672, 2002 WL 31962775, at *5 (D. Md. Dec. 16, 2002) (upholding the IRS's invocation of Exemption 3 for third-party tax material, explaining that "[c]learly, section 6103 prohibits the release of records containing tax return information of third parties," and agreeing "that return information of taxpayers other than Plaintiff cannot be released to Plaintiff").

### vi.    EOUSA Properly Asserted Various FOIA Exemptions

The FBI consulted with the Executive Office for United States Attorneys ("EOUSA") about certain records responsive to the FOIA Request, specifically, affidavits in support of a search warrant application.  *See* Seidel Decl. ¶ 127; Declaration of Justin P. Wilkinson (the "Wilkinson Decl.")[13] ¶ 11.  EOUSA asserted Exemptions 5 (attorney work product privilege and DPP) and 7(E) for those affidavits.  As with the FBI, the Wilkinson Declaration outlines that the affidavits (i) contain legal strategies, opinion, and legal impressions of the strength or weakness of a criminal prosecution, relevant to attorney work product privilege; (ii) are pre-decisional drafts among decision-makers at various components of DOJ, as relevant to DPP; and (iii) contain law enforcement's means and methods for investigating child pornography and exploitation crimes, as relevant for Exemption 7(E).  *See* Wilkinson Decl. ¶¶ 11, 14, 17-18. EOUSA properly asserted Exemptions 5 and 7(E) as for the affidavits in support of a search warrant.

### vii.    ICE Properly Asserted Various FOIA Exemptions

The FBI consulted with ICE about documents responsive to the FOIA Request.  *See* Seidel Decl. ¶ 126; Declaration of Lynnea Schurkamp (the "Schurkamp Decl.")[14] ¶ 5.  ICE asserts

---

[13]    A copy of the Wilkinson Decl. is attached as Exhibit Q to the Seidel Declaration.

[14]    A copy of the Schurkamp Decl. is attached as Exhibit P to the Seidel Declaration.

Exemption 6, 7(C), and 7(E).  *See* Schurkamp Decl. ¶¶ 10-18.  The Schurkamp Declaration outlines that the documents:  (i) contain the names of federal law enforcement officers and other government employees having interests in not becoming targets of harassment by individuals who may begrudge them in the performance of their federal mission, as well as the names, addresses, IP addresses, account numbers, and email addresses of non-ICE individuals, as relevant to Exemptions 6 and 7(C); and (ii) the steps taken in an investigation by a Homeland Security Investigations Task Force Officer, the release of which could disclose techniques or guidelines for law enforcement investigations which could be expected to risk circumvention of the law, as relevant to Exemption 7(E).  *See id.* ¶¶ 10, 11, 13, 17.  ICE properly asserted Exemptions 6, 7(C), and 7(E).

### viii.    The Government Has Satisfied Any Duty to Segregate

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  The duty to segregate does not require disclosure of records in which the non-exempt information that remains is meaningless.  *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (concluding that no reasonably segregable information exists because, as stated in the defendant's declaration, "the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words").

As set forth in the Seidel Declaration, Ahn Declaration, Wilkinson Declaration, and Schurkamp Declaration, all reasonably segregable information has been released to Plaintiff. Seidel Decl. ¶¶ 129, 130; Ahn Decl. ¶ 9; Wilkinson Decl. ¶¶ 19-21; Schurkamp Decl. ¶¶ 19-21.

Accordingly, Defendant has produced all "reasonably segregable portion[s]" of the responsive records. *See* 5 U.S.C. § 552(b).

## V.    **<u>CONCLUSION</u>**

For the reasons Defendant explains above, the Court should grant this Motion, enter summary judgment in Defendant's favor, and dismiss the Complaints with prejudice.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____

Alan C. Lazerow (Bar No. 29756)
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
(410) 209-4800
Alan.Lazerow@usdoj.gov

*Counsel for Defendant*