## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Mark Zaid, | |
| *Plaintiff,* | |
| v. | Case No. 8:21-cv-01130-GJH |
| Department of Justice, | |
| *Defendant.* | |

| | |
|---|---|
| Mark Zaid, | |
| *Plaintiff,* | |
| v. | Case No. 8:21-cv-02625-TDC |
| Department of Justice, | |
| *Defendant.* | |

## REPLY TO MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The United States Department of Justice (the "<u>Defendant</u>"), through its counsel, Erek L. Barron, United States Attorney for the District of Maryland, and Alan C. Lazerow, Assistant United States Attorney for that district, submits this Reply (the "<u>Reply</u>") to *Memorandum in Opposition to Defendant's Motion for Summary Judgment*, *see* ECF No. 20 (the "<u>Opposition</u>").

## I.    **INTRODUCTION**

Zackary Sanders, following a federal criminal investigation, was convicted of committing horrible child sex crimes.  Through the FOIA Request,[1] Plaintiff—who represents Sanders in related civil proceedings—seeks documents relating to the FBI's investigation.  The FBI produced several hundred pages of documents in response.  But the FBI withheld much of the material under Exemption 7(A) and various underlying FOIA exemptions.

In the *Motion for Summary Judgment*, *see* ECF No. 18 (the "Motion"), Defendant argued that the Declaration of Michael Seidel, *see* ECF No. 18-2 (the "First Seidel Declaration"), and the exhibits thereto establish that Defendant (and the IRS, EOUSA, and ICE)[2] adequately searched for responsive records and properly invoked the pertinent FOIA exemptions.  In response, Plaintiff concedes the adequacy of Defendant's search, but maintains—partly relying on a mostly self-serving declaration—that Defendant's invocation of Exemption 7(A) and certain other exemptions is inappropriate.[3]  Plaintiff is wrong.

*First*, through the First Seidel Declaration, and now the *Second Declaration of Michael G. Seidel in Support of Defendant's Reply to Memorandum in Opposition to Defendant's Motion for Summary Judgment* (the "Second Seidel Declaration")[4] and the *Declaration of FBI Special Agent*

---

[1]    Capitalized terms not otherwise defined in this Reply are given the meanings ascribed to them in the Motion for Summary Judgment.  *See* ECF No. 18.

[2]    In the Opposition, Plaintiff did not respond to Defendant's arguments that these agencies satisfied their obligations under FOIA.  As a result, Plaintiff has waived these arguments.  *See Conteh v. Shamrock Cmty. Ass'n*, No. 1:14-cv-00794, 2017 WL 371789, at *3 (D. Md. Jan. 26, 2017) (noting "that plaintiffs had abandoned their … claim when they failed to raise it in their opposition").

[3]    Plaintiff also concedes Defendant's invocation of Exemptions 3 and 7(E).  *See* Opposition, at p. 1 n.1.

[4]    A copy of the Second Seidel Declaration is attached as **Exhibit A**.

*David J. Backlund* (the "Backlund Declaration"),[5] Defendant has satisfied its burden of demonstrating that disclosure of the withheld documents could reasonably be expected to interfere with enforcement proceedings.  The supplemental declarations establish that the FBI's concerns in invoking Exemption 7(A) are that there are actual, ongoing investigation into individuals possibly committing horrible crimes similar to the ones of which Sanders was convicted and that disclosure of the withheld material would jeopardize those real-life investigations.  As a result, Defendant can establish that the disclosure of the withheld information can reasonably expected to interfere with enforcement proceedings, and summary judgment on Defendant's Exemption 7(A) invocation is warranted.

*Second*, contrary to Plaintiff's arguments, Defendant is entitled to summary judgment on its invocation of the exemptions as for the underlying withholdings and redactions—including the deliberative process privilege and the attorney work product privilege under Exemption 5; Exemptions 6 and 7(C); and Exemption 7(D).

For these reasons, and as Defendant explains more fully below and in the Motion, the Court should grant this Motion, enter summary judgment in Defendant's favor, and dismiss the Complaints with prejudice.

## II.   ARGUMENT

### A.   THE COURT SHOULD DISREGARD MUCH OF THE ZAID DECLARATION AS SELF-SERVING AND IRRELEVANT

Plaintiff supports the Opposition with an eight-page declaration, *see* ECF No. 20-1 (the "Plaintiff's Declaration").  It is well-settled that affidavits that a non-movant's "own, self-serving affidavit containing conclusory assertions and unsubstantiated speculation, ... [is] insufficient to

---

[5]      A copy of the Backlund Declaration is attached as **Exhibit B**.

stave off summary judgment." *Etcheber v. F.B.I.*, No. 2:13-cv-00752, 2014 WL 1319145, at *10 (D.S.C. Mar. 28, 2014) (citing *Larken v. Perkins,* 22 F. App'x 114, 115 (4th Cir. 2001)); *Shem-Tov v. DOJ*, No. 1:17-cv-02452, 2020 WL 2735613, at *4 (D.D.C. May 25, 2020) ("When a FOIA requester opposes a motion for summary judgment … , mere conclusory or speculative statements … will not suffice ….").

Here, the bulk of Plaintiff's affidavit is nothing more than his self-serving musings about what he believes Defendant's intentions and motives are in this matter and a re-hash of the legal arguments he pressed in the Opposition.  Just as an example, in Plaintiff's Declaration, Plaintiff concludes that "[t]he Seidel Declaration does not provide the level of specific information that would enable any court to trace a rational link between the nature of the document and the alleged likely interference."  *See* Plaintiff's Affidavit ¶ 12.  If that argument—containing no *facts* of the sort the Court could expect in a declaration opposing summary judgment—looks familiar, it is because it (and much of what Plaintiff floats in Paragraphs 10-18 of Plaintiff's Declaration) is copied and pasted from the Opposition itself.  *See* Opposition, at p. 11.  Plaintiff's musings and legal argument are inappropriate and the proper place for them is in the Opposition, not in a sworn declaration.  *See Jordan v. Bd. of Regents, Univ. Sys. of Georgia*, 583 F. Supp. 23, 28 (S.D. Ga. 1983) (rejecting a plaintiff's affidavit opposing summary judgment where "the affidavit is nothing more than a rehash of counsel's argument").

Worse are Plaintiff's ruminations about what he believes Defendant's intentions and motives are in this matter.  Plaintiff offers that "the Seidel Declaration's description of the 'information concerning physical and documentary evidence' *deliberately* does not provide the same level of specificity as required under FOIA."  *See* Plaintiff's Declaration ¶ 14 (emphasis added).  Along the same lines, Plaintiff "frankly, and respectfully" opines that "the FBI's failure

to provide proper justification to support its Exemption 7(A) claim is *deliberate and unacceptable*." *Id.* (emphasis added).  And lastly, Plaintiff concludes: "That the FBI has submitted a Declaration that falls so flat on its face … can only be viewed as intentional, perhaps attempting to take advantage of the fact that this Court handles far fewer FOIA cases than its neighboring sister court in the District of Columbia …."[6]  *Id.*  Unless Plaintiff lives in the FBI's head, Plaintiff does not know what Defendant's intent is in this matter.  But either way, Plaintiff's impressions of Defendant's conduct in handling his FOIA request—no matter how much FOIA experience Plaintiff has—are, again, inappropriate.  The Court should disregard Paragraphs 10-19 of Plaintiff's Declaration as self-serving, irrelevant, and misleading.

**B.**   **BECAUSE THE FBI SATISFIES ITS BURDEN OF DEMONSTRATING THAT DISCLOSURE OF WITHHELD DOCUMENTS COULD REASONABLY BE EXPECTED TO INTERFERE WITH ENFORCEMENT PROCEEDINGS,[7] DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS EXEMPTION 7(A) INVOCATION**

Defendant agrees that agency affidavits or declarations,

must demonstrate specifically how each document or category of documents, if disclosed, would interfere with the investigation, for example, how revelation of any particular record or record category identified as responsive to [plaintiff's] request would reveal to particular targets actual or potential, the scope, direction, or focus of the [agency's] inquiry.

Opposition, at p. 9 (quoting *Gray v. Army Crim. Investigation Command*, 742 F. Supp. 2d 68, 74 (D.D.C. 2010)).  As Defendant argued in the Motion, the First Seidel Declaration satisfies that burden.  *See* Motion, at pp. 24-25.  But Defendant has now done more, explaining, in the Backlund Declaration, that

---

[6]   Suffice it to say Defendant disagrees with Plaintiff's guess in this regard.

[7]   Under the Exemption 7(A) analysis, the Government must establish that the responsive records were compiled for law enforcement purposes.  Plaintiff concedes that they were.  *See* Opposition, at p. 8.

disclosure of the records and information sought by Mr. Zaid in his FOIA request would seriously jeopardize ongoing FBI investigations and prosecutions located both in this district and other districts because such disclosure would reveal the nature, direction, and focus of the FBI's investigation leading actual or potential subjects to destroy evidence, evade being identified by the FBI or other law enforcement entities, and continue their exploitation of children. The FBI continues to investigate users of the website identified in the investigation related to Mr. Sanders. Such users are typically registered users on multiple child exploitation websites, and when one website disappears they simply continue to seek access to CSAM through other similar websites. If these users become aware that law enforcement had investigated users from a particular site that they had visited, then it is likely these same users would add measures to avoid detection by law enforcement and would destroy evidence.

Backlund Decl. ¶ 5. Thus, the FBI's concerns in invoking Exemption 7(A) are not merely theoretical—there are actual, ongoing investigations into individuals possibly committing horrific child-sex crimes[8] that would be jeopardized by Plaintiff's requested disclosure. Defendant has thus satisfied its burden, through various declarations, of explaining how the requested disclosure "would reveal to particular targets actual or potential, the scope, direction, or focus of the [agency's] inquiry." *See Gray*, 742 F. Supp. 2d at 74.

Plaintiff also argues that "the criminal prosecution of Sanders has been completed …." Opposition, at p. 10. But as Plaintiff concedes, Sanders's proceedings are on appeal, and it is well-settled that "[a] pending appeal of a criminal conviction qualifies as an enforcement proceeding for purposes of Exemption 7(A)." *James v. U.S. Secret Serv.*, 811 F. Supp. 2d 351, 353 n.2 (D.D.C. 2011); *see also Kidder v. F.B.I.*, 517 F. Supp. 2d 17, 27 (D.D.C. 2007) ("A pending appeal of a criminal conviction qualifies as a pending or prospective law enforcement proceeding for purposes of Exemption 7(A).").

---

[8]     Given Defendant's interest in maintaining the integrity of actual, ongoing investigations into individuals committing heinous child-sex crimes, Defendant disagrees with Plaintiff's view that "[t]here is nothing within the record that comes close to the type of harm … which has been demonstrated in prior FOIA cases to justify Exemption 7(A) application." *See* Opposition, at p. 13.

Plaintiff next complains of the FBI's automated review process in completing a document-by-document review to determine the applicability of Exemption 7(A).  *See* Opposition, at p. 10 n.4.  Although Plaintiff—without citing any supporting authority— contends that he is "not aware of any legal authority … in which an automated process has been deemed legally sufficient," *see id.*, 5 U.S.C. § 552(a)(3)(D) contemplates a "review, manually *or by automated means*, [of] agency records …."  (Emphasis added).  Thus, the FOIA itself allows for the automated review of the sort Defendant conducted.  *See* First Seidel Decl. ¶ 48.

Plaintiff also argues that the First Seidel Declaration's "description of the 'information concerning physical and documentary evidence' deliberately does not provide the … level of specificity as required."  Opposition, at p. 11.  In the First Seidel Declaration, Defendant highlighted the types of information falling into that category and explained that "[t]o more fully describe this information could reasonably lead to disclosure of non-public aspects of pending investigative efforts."  First Seidel Decl. ¶ 53.B.I.  And in the Second Seidel Declaration, Defendant adds:

> One type of record that falls into this category is an investigative interview form (FD-302).  FD-302s are internal FBI forms in which case-related information is documented, usually as a result of an interview conducted by a special agent. Information in these forms may be used to further an investigation or as evidence in court.  More specifically, an FD-302 may contain information regarding the identity and background of crime witnesses or victims or of third parties who have knowledge of the criminal activities at issue, along with summaries of information provided by these individuals, which are then used to help support prosecution efforts.  Premature disclosure of identifying information or information provided by witnesses or victims could cause several harms.  If this information is released, such witnesses, victims, and third parties could be subject to retaliation and intimidation, including physical or mental harm, which would, in turn, have a chilling effect on future investigative efforts and prosecutions.  The FD-302 information learned during interviews is an integral part of a successful investigation and prosecution.  The release of this information would disrupt pending investigations and prosecutions and harm future investigative efforts and enforcement proceedings.

Second Seidel Decl. ¶ 8.  As a result, Defendant satisfies any burden it carries to describe the documents in this category with specificity.

Plaintiff next argues that the First Seidel Declaration "specifically fails with respect to the 'exchange of information between various law enforcement agencies' category" as it "provides no explanation of any threat to ongoing or future investigative efforts."  Opposition, at p. 12.  But in the First Seidel Declaration, Defendant noted that the release of information in this category "would likely disclose investigative information developed by other law enforcement agencies that have cooperated with and provided information to the FBI" and "would identify the FBI's investigative interest in particular individuals and subject third parties …."  First Seidel Decl. ¶ 53.B.II.  And in the Second Seidel Declaration, Defendant adds:

> Moreover, the premature disclosure of such information would potentially harm the free flow of investigative information between the FBI and its partner agencies and hinder the FBI's ability and the ability of other law enforcement agencies to effectively investigate crimes, especially international crimes. More specifically, premature disclosure of such information would cause several harms. First, the FBI's law enforcement agency partners could lose trust in the ability of the FBI to contain shared information, some of which may have been collected during their own respective investigations. Second, premature disclosure would suggest that the FBI placed its own investigative interests first without regard to the damage that disclosure could cause to investigations at the originating law enforcement agency. This would, in turn, render that law enforcement agency hesitant to share information, which would, in turn, diminish the scope or volume of reliable intelligence or investigative information available to the FBI, causing harm to FBI investigations.

Second Seidel Decl. ¶ 11.  As a result, Defendant satisfies any burden it has to explain the threat that release of information in this category would have on ongoing or future investigative efforts.

Plaintiff also argues that the First Seidel Declaration "refer[s] to concerns irrelevant under Exemption 7(A)," including "concerns about harassment of subject witnesses."  Opposition, at p. 12.  Plaintiff's position ignores consistent guidance that "Exemption 7(A) is … meant to prevent litigants from identifying and intimidating or harassing witnesses."  *Goodman v. U.S. Dep't of*

*Lab.*, No. 3:01-cv-00515, 2001 WL 34039487, at *3 (D. Or. Dec. 12, 2001) (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 239-40 (1978)); *see also Maydak v. USDOJ*, 218 F.3d 760, 762 (D.C. Cir. 2000) ("Another recognized goal of Exemption 7(A) is to prevent litigants from identifying and intimidating or harassing witnesses."). Thus, Defendant's concerns about preventing the harassment of witnesses, *see* First Seidel Decl. ¶¶ 53.B.II, 79, 84, are highly relevant to the Exemption 7(A) analysis.

Perhaps the elephant in the room is Judge Merryday's September 2022 decision in *Smith v. USDOJ*, No. 8:21-cv-01291, 2022 WL 4110291 (M.D. Fla. Sept. 8, 2022), in which the district court denied, *without prejudice*, the FBI's motion for summary judgment on the Exemption 7(A) issue in a case involving FOIA requests relating to Sanders. But that decision does not warrant the same result here for several reasons. For one, Plaintiff "made the unusual strategic decision to split up the fourteen categories [in his FOIA request] and bring separate FOIA lawsuits in different districts across the country, using residents of those districts (including … Mr. Zaid himself) as putative plaintiffs, but relying on substantially similar, if not identical, FOIA requests." *Michels v. USODJ*, No. 1:21-cv-01737, 2021 WL 8153753, at *1 (D. Colo. Nov. 30, 2021). There was obviously tactical upside in Plaintiff's decision to do that—notwithstanding the ire this raised in one federal judge[9]—but with that tactical play came litigation risk: the risk that different judges

---

[9]    In *Michels*, another case involving Plaintiff and relating to FOIA requests relating to Sanders, in deciding to stay that litigation given the many similar lawsuits Plaintiff filed or spearheaded around the country, the United States Magistrate Judge noted that "Plaintiff's counsel's slew of lawsuits across the country … necessarily involves the … waste … of significant judicial resources," noting that "[c]ounsel's tactic … unavoidably raises the specter of judge and forum shopping." *Michels v. USODJ*, No. 1:21-cv-01737, 2021 WL 8153753, at *3 (D. Colo. Nov. 30, 2021). According to the district court there, "[w]hile Plaintiff may be correct that there is nothing in FOIA that explicitly prevents him and the other plaintiffs who have sued from doing so, filing fundamentally identical cases in two (or five) different federal courts cannot be countenanced. It is an abuse of the system." *Id.*

would rule differently on similar issues.  *See Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3d 467, 472 n.4 (E.D. Va. 2019) ("[T]he opinion of another district court … is not binding precedent.").  And Defendant respectfully disagrees with Judge Merryday's opinion.[10]  But disagreement aside, this litigation is not on all fours with *Smith*.  *Smith* involves different parts of the FOIA request.  *Smith* involved different Seidel Declarations.  And now, with the Second Seidel Declaration and the Buckland Declaration (combined with the First Seidel Declaration), the quantum of evidence before the Court is different from that before the district court in *Smith*.

For these reasons, the Court should reject Plaintiff's Exemption 7(A) arguments and grant Defendant summary judgment on the Exemption 7(A) issue.

### C.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON ITS INVOCATION OF EXEMPTIONS AS FOR THE UNDERLYING WITHHOLDINGS AND REDACTIONS

#### i.   Exemption 5 – DPP

In the Motion, Defendant highlighted that the FBI asserted the DPP to protect handwritten, investigative interview notes, as well as draft affidavits and draft pen register and trap-and-trace documents, and argued that Defendant properly asserted the DPP.  *See* Motion, at pp. 24-25.  In the Opposition, Plaintiff appears to challenge Defendant's assertion of the DPP only relating to handwritten notes.  *See* Opposition, at p. 16.  The Court should deny Plaintiff's challenge.

Contrary to Plaintiff's argument, the First Seidel Declaration did not "fail[] to provide th[e] Court with a sufficient amount of information to demonstrate that the withholdings pertain to information that is *actually* predecisional."  *See* Opposition, at p. 16.  Far from lacking information, Paragraph 68 of the First Seidel Declaration provides:

> These notes are inherently predecisional in that they precede the final write-up within an FD-302 form.  The FD-302 formally documents specific information, but

---

[10]   Consistent with Judge Merryday's opinion, the defendant in the *Smith* litigation renewed its motion for summary judgment, which motion is pending.

not all information from the handwritten notes and specific facts [are] determined to be relevant to the investigative strategy. Often an interview may cover a variety of topics and information; however, not all topics discussed are found useful in the investigation. The process of reviewing the larger body of information contained in the handwritten notes and then selecting certain relevant pieces and then distilling those pieces within the appropriate context within an official FBI FD-302 form is both predecisional and a deliberative process. Furthermore, a Special Agent's ("SA") handwritten notes often include off-the-cuff and unfiltered observations, facts, and impressions collected during an interview with a subject or witness that may later be determined as irrelevant or unnecessary, and thus eliminated from the final interview write-up. In this particular case, the FBI protected handwritten notes from interviews conducted in the course of Sanders's criminal investigation. When SAs or other FBI employees take such unvarnished notes and later comb through them for relevancy and accuracy, they make strategic decisions as to the validity and utility of the information needed to further the investigation and edit accordingly prior to memorializing the relevant information within the final product. In addition, an SA may choose to alter the line of questioning during an interview based on the information provided. This altered strategy may be reflected within the handwritten notes but the final FD-302 may only reflect the final strategy. Peeking behind the final FD-302 to compare against the deliberative and predecisional handwritten notes of the interview would allow individuals to discern what portions of the interview were deemed relevant and which were not, as well as to discern the SA's interview strategy. Such analysis of the differences between the handwritten notes and the final FD-302 would reveal the very deliberative process protected by the privilege. FD-302s do not mention the wide range of information available in the handwritten notes, but rather the FD-302s stand on their own. These materials reflect real-time deliberations during and after an interview and which were integral to reaching final agency decisions on strategy that were key to a decision-making process aimed at developing and making the best strategic decisions to further the investigation.

Thus, the First Seidel Declaration provides a wealth of information both about why notes preceding an FD-302 in time are predecisional generally and why that is particularly so in this case. It is well-settled that, even where interview notes "are largely factual, they may still be subject to Exemption 5 if the factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents that would reveal the agency's deliberative process." *Justice v. Mine Safety & Health Admin.*, No. 2:14-cv-14438, 2015 WL 4621543, at *9 (S.D. W. Va. July 31, 2015) (cleaned up); *see also Mapother v. DOJ*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (holding that an internal report was exempt under Exemption 5's DPP because release could

reveal how the agency staff extracted pertinent facts from relevant source documents, organized them to suit a specific purpose, and identified significant issues).  Defendant properly asserted the DPP.

### ii.  **Exemption 5 – Attorney Work Product Privilege**

In the Motion, Defendant highlighted that the FBI asserted the attorney work product privilege to protect draft affidavits in support of an application for a search warrant, which materials were created in anticipation of litigation, and argued that Defendant properly asserted the attorney work product privilege.  *See* Motion, at p. 26.  In the Opposition, Plaintiff's only argument—without citation to any supporting authority—is that the First Seidel Declaration "does not sufficiently address why the factual matter outlined in the 'draft affidavits' must remain protected even if the attorney's opinion(s) remains protected."  *See* Opposition, at p. 18 (internal citation omitted).  Plaintiff is again wrong.

Contrary to Plaintiff's unsupported assertion that parts of the draft affidavits are not protected, many courts have held to the contrary.  *See Borda v. USDOJ*, 306 F. Supp. 3d 306, 320 (D.D.C. 2018) ("Recent cases have generally held that draft affidavits ... are covered by the work-product rule ….") (citation omitted); *see also Inst. for Dev. of Earth Awareness v. People for Ethical Treatment of Animals*, 272 F.R.D. 124, 125 (S.D.N.Y. 2011) ("The lawyer's drafts [of affidavits] … do not lose their character as work product because a final executed version has been affirmatively used in the litigation."); *Miller v. USDOJ*, 562 F. Supp. 2d 82, 114-15 (D.D.C. 2008) (upholding withholding a draft affidavit in full under the attorney work product privilege); *McKinley v. FDIC*, 744 F. Supp. 2d 128, 142 (D.D.C. 2010).

      **iii.**      <u>**Exemptions 6 and 7(C)**</u>

In the Motion, Defendant noted that Defendant withheld, under Exemptions 6 and 7(C), names and other identifying information of several categories of individuals, and argued that summary judgment as to Defendant's Exemptions 6 and 7(C) invocations is warranted.  In the Opposition, Plaintiff "concedes the appropriateness of Exemption 7(C) for professional staff and third parties," but "maintains his challenge to the withholding of the identities of FBI Special Agents, local law enforcement and non-FBI personnel."  Opposition, at p. 20.  Plaintiff "further narrow[ed] the scope of his challenge to officials who held a GS-14 supervisory position or local equivalent."  *Id.*  The Court should reject Plaintiff's arguments.

For one, the First Seidel Declaration specifically outlines, for each category of individuals, how it weighed the individual's privacy interests against any public interest in disclosure.  *See* First Seidel Decl. ¶¶ 78-88.  That alone suffices.  But to Plaintiff's line-drawing for GS-14 positions and above, that line is arbitrary.  Disclosing the name or other identifying information about a GS-14 or GS-15 employee (or local equivalent) would not shed any more light on the operations and activities than would the disclosure of such information about, for instance, a GS-9 employee.  Second Seidel Decl. ¶ 20.  Although the FBI would disclose information about a GS-14 or GS-15 employees if the employee was in a public-facing position, the FBI determined that the GS-14-or-higher employees within the records at issue were not in public-facing positions and, therefore, the FBI did not disclose that information.  *See id.*  Thus, Defendant's invocations of Exemptions 6 and 7(C) were and remain proper.  *See, e.g.*, *Reporters Comm. for Freedom of the Press v. U.S. Customs & Border Patrol*, 567 F. Supp. 3d 97, 126-27 (D.D.C. 2021) (upholding defendant's invocation of Exemptions 6 and 7(C) for "non-public facing" employees); *see also*

*Dale v. DEA*, No. 1:20-cv-01248, 2022 WL 3910502, at *6 (D.D.C. Aug. 31, 2022) (citing cases);

*Skinner v. USDOJ*, 806 F. Supp. 2d 105, 114-15 (D.D.C. 2011) (citing cases).

      iv.    **Exemption 7(D)**

In the Motion, Defendant noted that it withheld the names and other identifying information of and information provided (outside of its investigative use) by individuals and foreign government and law enforcement entities under an express assurance of confidentiality, and argued that it was entitled to summary judgment on its Exemption 7(D) invocations. *See* Motion, at pp. 28-29. In the Opposition, in arguing that summary judgment on the Exemption 7(D) invocations is inappropriate, Plaintiff, although conceding that the "Seidel Declaration does note that certain individuals were provided with express assurances of confidentiality," Opposition, at p. 20, argues that the First Seidel Declaration does not reveal that there were foreign law enforcement partners at issue here. This is incorrect and Defendant is entitled to summary judgment on the Exemption 7(D) issues.

To Plaintiff's point about whether there actually was a foreign law enforcement partner at issue in this case, the FBI confirms that its investigation of Sanders began when the FBI received a tip from a foreign law enforcement agency. *See* Backlund Decl. ¶ 4. The foreign law enforcement agency advised that it obtained information relating to Sanders's criminal activity through its own, independent investigation. *Id.* The United States has a long history of sharing criminal investigative information with that foreign law enforcement agency, and that sharing relationship has led to the identification and arrest of multiple producers of child sexual abuse material and the seizure of evidence related thereto. *Id.* ¶ 6. Disclosure of the information Plaintiff seeks—including the name of or country affiliated with the foreign law enforcement agency partner—would violate the express assurance of confidentiality that the United States has given

that partner and jeopardize the long-standing relationship with that partner.  *Id.*   Under these circumstances, Defendant's invocation of Exemption 7(D) was correct.  *See Shapiro v. DOJ*, No. 1:12-cv-00313, 2020 WL 3615511, at *35 (D.D.C. July 2, 2020).

> ### D.    DEFENDANT SATISFIED ITS BURDEN TO DEMONSTRATE SEGREGABILITY

In the Motion, Defendant argued that it satisfied its burden to segregate releasable information from that being withheld.  *See* Motion, at pp. 33-34.  In the Opposition, Plaintiff argues that "[a]ll [the First Seidel Declaration] claims is that the FBI has determined no further information can be segregated from the responsive records aside from 68 pages of responsive records that were released in part."  Opposition, at p. 22.  Plaintiff is again wrong.

First, by arguing that "the FBI has done nothing to present any credible evidence that segregable portions of the records in question cannot be released," *see id.*, Plaintiff ignores that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  It is Plaintiff who bears a burden to provide a "quantum of evidence" to rebut the presumption, *see id.*, and thus it is Plaintiff who is the party failing to meet a burden as to segregability.  But perhaps more to the point, the First Seidel Declaration does more than simply claim "that the FBI has determined no further information can be segregated …."  Opposition, at p. 22.  Instead, in the First Seidel Declaration, Defendant highlighted that "[a]ll records responsive to Plaintiff's request and subject to the FOIA were reviewed to achieve maximum disclosure consistent with the access provisions of the FOIA," and "[f]or the records not subject to categorical denial, the FBI conducted a page-by-page, line-by-line review, of and processed 1,758 pages of responsive records."  First Seidel Decl. ¶ 130; *see Freeman v. FBI*, No. 1:18-cv-02769, 2022 WL 4365734, at *3 (D.D.C. Sept. 21, 2022) (finding that the FBI satisfied its segregability obligation

where the declaration provided that "all documents responsive to the plaintiff's request were reviewed to achieve maximum disclosure") (cleaned up); *see also Manning v. USDOJ*, 234 F. Supp. 3d 26, 38 (D.D.C. 2017) (finding that the FBI satisfied its segregability obligation where the declaration provided that the FBI conducted a "document-by-document review of all records containing information responsive to ... plaintiff's request").  That detailed reviewed led to the FBI releasing 211 pages in full and 68 pages in part, thus evidencing that Defendant took its obligation to disclose as much information as it could seriously.  Paragraphs 129 and 130 of the First Seidel Declaration explain its robust segregability review and, in any event, "[n]othing in the record calls into question the good-faith presumption afforded to the defendant's declarations." *See Freeman*, 2022 WL 4365734, at *3 (cleaned up).  The Court should conclude that Defendant satisfied its segregability obligation.

## III.    <u>CONCLUSION</u>

For the reasons Defendant sets forth above and in the Motion, the Court should grant this Motion, enter summary judgment in Defendant's favor, and dismiss the Complaints with prejudice.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____

Alan C. Lazerow (Bar No. 29756)
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
(410) 209-4800
Alan.Lazerow@usdoj.gov

*Counsel for Defendant*